UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                           :

GLENN MARCUS,                     :

                Petitioner,       :

                           :

      -against-           :

                           :

UNITED STATES OF AMERICA,      :

                           :

              Respondent.    :

                           :

-------------------------------------------------------------------- X

14-CV-5780 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

      Petitioner Glenn Marcus moves, pursuant to 28 U.S.C. § 2255, to vacate his conviction

for forced labor in violation of 18 U.S.C. § 1589. Petitioner argues that his trial counsel rendered

ineffective assistance by (1) failing to object to the jury's consideration of evidence of

petitioner's conduct prior to the enactment of the law under which he was prosecuted; (2) failing

to call certain fact and expert witnesses; and (3) making numerous other errors during trial.

Petitioner also argues that his conviction and sentence must be invalidated because the forced

labor statute does not apply to the alleged acts and, in any event, he is actually innocent.

Petitioner requests an evidentiary hearing on these claims. For the reasons set forth below, I find

that a hearing is not warranted, that petitioner has not established that his trial counsel provided

ineffective assistance, and that petitioner is not entitled to relief on due process or actual

innocence grounds. Accordingly, the petition is denied.

**BACKGROUND**

I.     **Petitioner's Trial and Conviction**

Petitioner's conviction stems from conduct related to an alternative sexual lifestyle known as bondage, dominance/discipline, submission/sadism, and masochism ("BDSM").[1] At trial, Jodi, the complaining witness, testified that in 1999 she entered into a consensual BDSM relationship with the petitioner, who subsequently used force and coercion to prevent her from terminating the relationship when she tried to do so. Jodi further testified that she remained with petitioner against her will for nearly two years, during which time she was forced to do work for petitioner, namely, creating and maintaining petitioner's BDSM website and participating in sexual acts that were photographed and placed on the website.

A.     **Events from 1998 to October 1999**

Petitioner met Jodi in the fall of 1998 in an online chat room devoted to BDSM. During their early conversations, petitioner shared information with Jodi about the type of BDSM that he practiced, for example, that he did not allow the use of any limits or safe words. Jodi, meanwhile, shared intimate details about her life experiences and family. With the help of two women, Joanna and Celia, who identified themselves as petitioner's "slaves," petitioner convinced Jodi to travel from her home in the Midwest to Joanna's apartment in Maryland in order to meet him in person.[2] During this three or four day visit in October 1998, petitioner engaged in consensual BDSM activities with Jodi, including whipping her and carving the word "slave" into her stomach with a knife.

Jodi returned to Maryland for a second visit in November 1998. At that time, petitioner

_____

[1] Unless otherwise noted, the facts in this section are taken from the order dated May 17, 2007, denying petitioner's Rule 29 and Rule 33 motions in his criminal case. See United States v. Marcus, 487 F. Supp. 2d 289 (E.D.N.Y. 2007).
[2] At the time, petitioner lived in the New York City area.

told her that she belonged to him and needed to be with him, and convinced her to move to Maryland to live with Joanna. Jodi submitted a "petition" in which she asked petitioner for permission to serve as his slave, referring to herself by the name he had given her, "pooch." The petition stated, among other things, that Jodi would serve "with no limitations," and that if she asked to be released, petitioner should "please ignore these words." Jodi testified, however, that she believed she would be able to leave the relationship if she wanted to, based on prior statements by petitioner that he did not want a "slave" who did not want to serve him.

Jodi moved to Joanna's apartment in January 1999. She got a job as a nanny, and although she did not pay rent, she had a key to the apartment. Amended Petition ("Am. Pet."), Dkt. #7, at 9. Petitioner would visit for a few days every one or two weeks. During these visits, petitioner would engage in BDSM activities with Jodi, Joanna, and sometimes other women as well. These activities included branding Jodi with a hot coat hanger and whipping, choking, and tying Jodi to a wall during intercourse. Petitioner photographed some of these activities and posted the pictures on a website known as "Subspace." Jodi was required to write diary entries describing the activities, which were also posted on the website.

Jodi called petitioner "sir," but he referred to her as "it" or "pooch," and insulted her regularly. Petitioner required Jodi to ask permission to wear clothing, eat, drink, speak, sleep, or communicate with her family. The women in BDSM relationships with petitioner were generally required to follow his instructions, and would suffer punishment if they failed to do so. Jodi testified that she was punished nearly every time she saw petitioner, including being whipped or placed in a large, metal dog cage. These punishments became increasingly severe several months after Jodi moved to Maryland, and she began feeling depressed. During one such punishment, petitioner slapped Jodi in the face and burned her in various places on her body with a cigarette.

3

At some point during this period, petitioner instructed Jodi to convince her younger sister to visit her in Maryland and give her drugs so that he could rape her. When Jodi refused, petitioner told her she would be severely punished. In October 1999, petitioner arrived in Maryland to inflict that punishment. Jodi testified that, after petitioner handcuffed her to a wall and went to take a nap, she had a moment of clarity and decided to leave him. As Celia helped Jodi get down from the wall, Joanna woke petitioner, who demanded that Jodi be returned to the wall. Jodi informed petitioner that she wanted to leave, but petitioner continued to inflict extreme punishment[3] on her and had intercourse with her, all of which was photographed for the website, and about which Jodi was later forced to write a corresponding diary entry. Jodi testified that at this point the relationship became non-consensual and that, although she no longer wished to be involved with petitioner, she remained with him out of fear.

**B.    Events from November 1999 to October 2000**

In November 1999, Joanna told petitioner, by phone, that she wanted to leave him. Petitioner threatened to harm members of Joanna's family and to show them photos of Joanna from the BDSM website. Jodi testified that she thought petitioner would do the same to her if she tried to leave him. Jodi went home to the Midwest for Christmas in 1999 to visit her family, and returned to Maryland thereafter.

In January 2000, petitioner instructed Jodi to move to New York, where she lived with Rona, a woman who Jodi was told was another of petitioner's "slaves." Petitioner instructed Jodi to create and manage a new BDSM website called "Slavespace." After creating the website, Jodi worked on it for eight to nine hours per day, updating photographs and diary entries and clicking

---

[3] The punishment inflicted on Jodi by petitioner included inserting a whiffle ball into her mouth and closing her lips shut with surgical needles, placing a hood over her head, beating her with a cane, attempting to sew her vagina closed with a sewing needle and thread, and carving petitioner's initials into her feet with a knife.

on banner advertisements to increase revenue and enhance its visibility on the internet.[4] Revenues from the website included several hundred dollars per month in membership fees and an additional several hundred dollars from advertising, all of which went to petitioner. Jodi testified that she did not want to work on the website, but did so because she was afraid of petitioner, who would punish her if she failed to post diary entries or pictures quickly enough, or if the website made less money than he expected.

During the time Jodi lived with Rona in Queens, New York, petitioner visited Jodi approximately once a week, and continued to inflict severe punishments and engage in violent sexual behavior with her. In one incident, petitioner whipped Jodi so hard that she vomited; on another occasion, he held a plastic bag over her head until she passed out. Jodi testified that even though these incidents were non-consensual, she continued to remain with petitioner because she was afraid how he would react if she left. Additionally, Jodi testified that she remained with petitioner because the incidents were photographed for the website and petitioner had previously threatened to send photographs of Jodi to her family and the media, giving her concern that he would publicly expose her if she tried to end the relationship. These incidents, and the work on the Slavespace website, continued through October 2000 and into 2001.

### C.    Events from February 2001 to 2003

In February 2001, petitioner zipped Jodi into a plastic garment bag and choked her through the plastic. In April 2001, when petitioner was disappointed with Jodi's work on the website, he put a safety pin through her labia and attached a padlock to it, closing her vagina, while Rona muted Jodi's screams with a washcloth and the defendant whipped Jodi with a knife. This incident was photographed and documented on the website.

---

[4] In November 2000, Jodi began commuting from Queens to Manhattan, where she worked in a corporate office earning $42,500 a year.

Finally, in March 2001, after Jodi told petitioner that she wanted to leave, petitioner agreed to let her end the relationship, but only after she endured one final punishment. Jodi testified that petitioner drove her to the home of a woman named Sherry; there, he inflicted severe punishment on Jodi, banging her head against a beam in the basement ceiling, tying her hands and ankles to the beam, beating her and whipping her while she was hanging from the beam, drugging her, and having sexual intercourse with her. Petitioner inserted a surgical needle through Jodi's tongue, which made it difficult for her to scream. After whipping her for an hour, petitioner left Jodi suspended on the beam for over half an hour. The entire incident was photographed, and Jodi was forced to write a diary entry about it to post on the website.

Jodi continued to live with Rona through August 2001, when petitioner allowed Jodi to move into her own apartment after Rona requested that she leave. Petitioner alleges that the relationship ended in September of 2001. Am. Pet. at 8. Although her interactions with petitioner became less frequent and less extreme, Jodi testified that she continued to stay involved with petitioner to maintain some control over his use of her pictures on the website.[5] During this time, petitioner posted diary entries on the website exposing personal information that Jodi had told him about her family, and offered incentives to website subscribers to photograph Jodi on the street, after providing information about the location of her apartment. Jodi maintained contact with petitioner until 2003 or 2004.[6]

---

[5] After she moved out, Jodi created her own BDSM website but continued to socialize with petitioner and his family. Attached to the petition is an e-mail from Jodi to petitioner dated February 1, 2002, in which Jodi apologizes to petitioner, apparently for asking him to return her apartment keys, and informs him that she "WAS and WOULD BE grateful to work on the [web]site" if he "ever allowed [her] to again." Feb. 1, 2002 E-Mail from Jodi ("2/1/02 E-mail"), attached as Ex. A to Am. Pet., Dkt. #7.

[6] Petitioner alleges that in 2004, the two became involved in a dispute over the use on the Slavespace website of Jodi's photographs, which petitioner believed he owned and refused to remove. Mem. of Law in Support of Am. Pet. ("Mem."), Dkt. #7, Exh. 2, at 6.

## II. Procedural History

On February 9, 2007, the government filed a superseding indictment charging petitioner with violations of the sex trafficking statute, 18 U.S.C. § 1591(a)(1), and the forced labor statute, 18 U.S.C. § 1589, enacted as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), a sub-section of the Victims of Trafficking and Violence Protection Act of 2000. See Pub. L. No. 106-386, 114 Stat. 1464 (2000). While these statutes did not become effective until October 28, 2000, the superseding indictment charged petitioner with violating the statutes between "January 1999 and October 2001," Superseding Indictment at 1, United States v. Marcus, No. 05-CR-457 (E.D.N.Y.), Dkt. #196, and the government presented evidence of petitioner's conduct during the entire period charged in the indictment. Petitioner and his counsel did not object to this evidence at the time, and did not raise this issue in his motion for judgment of acquittal. On March 5, 2007, after a six-day trial and seven days of deliberation, the jury found petitioner guilty of sex trafficking and forced labor.[7] I sentenced petitioner to nine years' imprisonment.

On direct appeal, petitioner argued, for the first time, that the TVPA had been applied retroactively in his case, and that the jury may have convicted him exclusively based on actions that took place before the law came into effect on October 28, 2000, in violation of his due process rights. Because it had not been raised before this court, the Court of Appeals for the Second Circuit reviewed the issue for plain error and, under the Circuit's then-existing precedent, vacated the convictions and remanded for retrial, holding that retrial was necessary "whenever there is any possibility, no matter how unlikely, that the jury could have convicted based exclusively on pre-enactment conduct." United States v. Marcus, 538 F.3d 97, 102 (2d Cir. 2008). A concurring opinion noted, however, that the Second Circuit precedent "with regard to plain-error review of ex post facto violations does not fully align with the principles inhering in

---

[7] The jury found petitioner not guilty of disseminating obscene materials in violation of 18 U.S.C. § 1462.

the Supreme Court's recent applications of plain-error review." Id. at 03 (Sotomayor, J., concurring).

The government sought, and the Supreme Court granted, certiorari. The Supreme Court reversed the Second Circuit, holding that an appellate court may "correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, 560 U.S. 258, 262 (2010) (internal quotation marks omitted) (alteration in original). The Court found that the standard applied by the Second Circuit below, under which "any possibility" of a different outcome, "no matter how unlikely," necessitated remanding the case for retrial, was inconsistent with the third and fourth prongs of the standard for plain-error review, id. at 263 (emphasis omitted), which require some showing of "individual prejudice," id. at 265, and, in most cases, a finding that the error affected the jury's verdict, id. at 265-66.

On remand from the Supreme Court, the Second Circuit conducted a new plain-error analysis, examining in particular whether the overall effect of applying the TVPA to petitioner's pre-enactment conduct without a remedying jury instruction was "sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the error." United States v. Marcus, 628 F.3d 36, 42 (2d Cir. 2010). The court concluded that the pre- and post-enactment conduct supporting the sex trafficking charge differed materially, that the jury may have convicted petitioner solely on the pre-enactment conduct, and that there was thus a reasonable probability that the erroneous jury charge affected the outcome of the trial. Id. at 43-

8

44. As to the forced labor conviction, however, the court held that there was not a reasonable probability that the jury would have acquitted petitioner absent the error. <u>Id.</u> at 42. The court determined that the government had presented post-enactment evidence sufficient to satisfy the elements of that charge. <u>Id.</u> ("From January 2000 until at least the spring of 2001, [petitioner] forced Jodi, through the persistent threat of serious physical harm and actual physical harm, to create and maintain a commercial BDSM website from which only [petitioner] derived pecuniary gain.").[8] The court noted that it found "no reasoned basis to differentiate between [petitioner's] pre- and post-enactment conduct" with respect to the forced labor charge, and no reason to believe the jury did either. <u>Id.</u> at 43. The court also rejected petitioner's argument that he was prejudiced by the introduction of extensive pre-enactment evidence, finding that the government had "presented substantial evidence of [petitioner's] post-enactment conduct, and nothing about the nature or quantity of evidence of [his] pre-enactment conduct . . . [suggests] that it is reasonably probable that the jury would have acquitted [petitioner] but for the evidence of [his] pre-enactment conduct." <u>Id.</u> The court thus affirmed the forced labor conviction, vacated the sex trafficking conviction, and remanded the case to this court for retrial and/or resentencing.[9]

The government elected not to retry petitioner on the sex trafficking count, and on March 12, 2012, petitioner was resentenced in this court to eight years' imprisonment and five years' supervised release on the forced labor count. Amended Judgment, <u>United States v. Marcus</u>, No.

---

[8] The Second Circuit also noted that, although petitioner's counsel argued that Jodi had obtained a full-time job in November 2000 and Rona testified that Jodi did not work on the website after acquiring that job, these arguments "do not compel the conclusion that the jury believed that Jodi provided website related services pre-enactment rather than post-enactment," and that at a minimum, Jodi was still forced to write new diary entries in March and April of 2001. <u>Id.</u> at 42, n.5.

[9] The Court of Appeals also addressed petitioner's argument that the forced labor statute did not apply to his conduct because he and Jodi were engaged in an "intimate domestic relationship." <u>Id.</u> at 44. The court noted that the jury was instructed that consensual BDSM activities alone could not constitute the basis for a conviction under the sex trafficking charge, "and there is no reason to believe that the jury did not understand this instruction to be equally true with respect to the forced labor charge." <u>Id.</u> at 45. The court ultimately held that the "plain meaning of the forced labor statute unambiguously applies to [petitioner's] conduct." <u>Id.</u> Finally, the court summarily dismissed as "without merit" petitioner's claim that his due process rights were violated by permitting the two government witnesses to testify using only their first names. <u>Id.</u> at 45 n.12.

05-CR-457 (E.D.N.Y.), Dkt. #308. Petitioner's appeal of his sentence was denied, United States v. Marcus, 517 F. App'x 8, 9-10 (2d Cir. 2013), as was his petition for a writ of certiorari to the Supreme Court, United States v. Marcus, 134 S. Ct. 135 (Oct. 7, 2013).

Petitioner filed this § 2255 petition on October 2, 2014, raising claims of ineffective assistance of counsel and actual innocence. Petition, Dkt. #1. At the time it was filed, petitioner's counsel moved for an extension of time to file a memorandum of law in support of the petition. Dkt. #2. On October 7, 2014, I ordered the government to respond to the petition, Dkt. #4; the government filed its response on October 22, 2014, Government's Response to Petitioner ("Gov. Mem."), Dkt. #6. Petitioner then filed an amended petition on October 23, 2014, Dkt. #7, and a memorandum in support of the amended petition, Dkt. #7, Ex. 2. The government responded to the amended petition, urging the court to deny it on the substantive grounds articulated in the government's previous response and arguing that the amendment was untimely, Dkt. #8, and petitioner filed a reply, Dkt. #9. Pursuant to a November 14, 2014 order, Dkt. #11, petitioner's original trial counsel submitted an affidavit responding to the allegations of ineffective assistance raised in the amended petition, Declaration of Maurice H. Sercarz ("Sercarz Decl."), Dkt. #15, and petitioner's counsel submitted a response, Declaration of Herald Price Fahringer, Esq. ("Fahringer Decl."), Dkt. #12.

## DISCUSSION

### I. Timeliness

Petitioner argues that his motion is timely, as it was filed within the one-year window provided by AEDPA,[10] an amended motion and a memoranda in support were filed within 21

---

[10] Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress imposed a one-year statute of limitations on filing a § 2255 petition, which in this case runs from "the date on which the judgment of

days of the original filing, and the amendment related back to the date of the original filing. Mem. at 9-10; Reply Brief in Support of Am. Pet. ("Reply"), Dkt. #9, at 1-6. The government objects, arguing that petitioner has asked the court to toll the statute of limitations in order to file supplemental briefing but has not provided evidence of extraordinary circumstances or diligent pursuit of his rights justifying an extension. Gov. Mem. at 5-6. After reviewing the original and amended petitions, I find that the amendments are minor or cosmetic, relate to the facts and legal arguments that were raised in the original petition, and, in any event, do not alter the analysis of the merits of the petition. I will thus consider petitioner's arguments as raised in his amended petition.

## II.     Petitioner's Ineffective Assistance of Counsel Claims

Petitioner challenges his conviction on the ground that he received constitutionally ineffective assistance from his trial counsel, Maurice Sercarz, Esq. Mem. at 1. Specifically, petitioner alleges that Mr. Sercarz "substantially prejudiced [petitioner]" because he failed to challenge the inclusion of pre-TVPA conduct in the indictment or the introduction of such evidence at trial, and did not request appropriate limiting instructions, id.; "failed to call material witnesses, including necessary experts," id. at 2; "failed to utilize critical evidence," id.; and failed to "properly prepare for trial," id. Petitioner argues that these errors, individually and cumulatively, amount to constitutionally ineffective assistance and entitle petitioner to a new trial. Id.

To establish a violation of the Sixth Amendment right to effective assistance of counsel, petitioner must meet the two-prong test established by Strickland v. Washington, 466 U.S. 668

conviction bec[ame] final." 28 U.S.C. § 2255(f)(1). Petitioner's conviction became final on October 7, 2013, when the Supreme Court denied his petition for a writ of certiorari as to his resentencing.

(1984). First, petitioner must demonstrate that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." Id. at 688. The court must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks omitted); see also United States v. Haynes, 729 F.3d 178, 196 (2d Cir. 2013) (petitioner must show that trial counsel's decisions were not strategic because they were "outside the wide range of professionally competent assistance"). Second, petitioner must demonstrate that he suffered prejudice as a result of the ineffective assistance of counsel; that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 111-12 (2011). Where multiple errors are alleged, the court must "consider [them] in the aggregate," Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001), and evaluate the "cumulative effect of all of [trial] counsel's actions," Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

## A.      Petitioner's Request for an Evidentiary Hearing

As a preliminary matter, petitioner requests a hearing in order to "present testimony from the various witnesses [petitioner alleges trial counsel failed to call] regarding whether they would have testified . . . and the nature of their testimony," and to provide trial counsel with the opportunity to "present evidence relating to his representation." Mem. at 35.

Pursuant to Section 2255, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with

respect thereto." 28 U.S.C. § 2255(b). A petitioner "need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted). Although dismissal without a hearing is generally inappropriate where factual disputes exist, Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011), "[i]f it plainly appears from the face of the petitioner and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition," Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts; see also Puglisi, 586 F.3d at 213.

To warrant a hearing, a petitioner's "application must contain assertions of fact that [the] petitioner is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987). The court, viewing the record "in the light most favorable to the petitioner," then determines whether "the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi, 586 F.3d at 213. If any material facts are in dispute, and petitioner can identify available sources of relevant evidence, petitioner's claims will warrant a hearing. Id. at 213-14. However, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14; see also Dalli v. United States, 491 F.2d 758, 760 (2d Cir. 1974) (in order to merit a hearing, petitioner "must set forth specific facts which he is in a position to establish by competent evidence"). Courts look "primarily to the [petitioner's] affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief." Dalli, 491 F.2d at 760; see also Aiello, 814 F.2d at 113-14 (summary rejection of habeas petition improper when it is supported by a "sufficient affidavit" which,

along with government's affidavit, is used to "determine the existence of genuine issues of material fact"); Giuca v. Lee, No. 12-CV-02059, 2013 WL 2021336, at *3 (E.D.N.Y. May 14, 2013) (holding that a hearing is warranted only where affidavits contain assertions of fact that petitioner is able to establish by competent evidence); Boakye v. United States, No. 09 Civ. 8217, 2010 WL 1645055, at *6 (S.D.N.Y. Apr. 22, 2010) ("To obtain an evidentiary hearing, Petitioner must . . . set forth in an affidavit specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief."); Moises v. United States, No. 03 Civ. 8582, 2009 WL 54260, at *6 (S.D.N.Y. Jan. 9, 2009) ("In determining whether a hearing is required [the court] must look at the affidavits or other evidence proffered in support of the application."). The court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.

Even where a hearing may be warranted, a district court has the discretion to "choose a middle road" that "expand[s] the record without conducting a full-blown testimonial hearing." Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001); see also Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003) (permitting court to decide disputed facts on the basis of written submissions). "A judge may, inter alia, rely upon his or her knowledge of the record, request that affidavits and other documentary evidence be submitted in lieu of a hearing, or, in the case of an ineffective assistance of counsel claim, request that counsel respond to petitioner's claim." United States v. Sessa, No. 92-CR-351, 2011 WL 256330, at *56 (E.D.N.Y. Jan. 25, 2011); see also Jian Wang v. United States, 458 F. App'x 44, 45-46 (2d Cir. 2012) (detailed written affidavit of former trial counsel sufficient to decide petition without evidentiary hearing).

Petitioner argues that a hearing would shed light on "whether [trial] counsel's failings

were based on strategy or ineptitude," and afford trial counsel "an opportunity to be heard relating to why he did, or failed to do, certain things during the trial." Mem. at 33-34. However, by order dated November 14, 2014, I granted Mr. Sercarz permission to file a responsive affidavit addressing the allegations contained in the petition. Dkt. #11; see Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). Mr. Sercarz submitted a declaration on March 6, 2015. Sercarz Decl. Mr. Sercarz states that although he turned over his case files to petitioner's current counsel in connection with the direct appeals, id., ¶ 2, he was able to provide an account of his representation at trial based on his review of the trial transcript, various notes and memos still in his possession, and conversations with his colleague, who also worked on the case, id., ¶ 3.

Petitioner also wishes to present testimony from his proposed witnesses at an evidentiary hearing. According to petitioner's counsel, the "information relating to the testimony of each witness" as described in the petition and supporting memorandum "was provided by [petitioner,] who has a good faith belief that the witnesses would have testified at trial on his behalf, if called." Mem. at 21 n.17. Petitioner does not identify any competent evidence substantiating his unsworn representations to counsel regarding who would have testified on his behalf and what they would have said. For example, while petitioner claims that two women, Joanna and Celia, would have testified on his behalf, Am. Pet. at 9-10, Mr. Sercarz states in his sworn declaration that he attempted to communicate with both women prior to trial and neither wanted to speak with him, Sercarz Decl., ¶ 25. Although petitioner's counsel filed a responsive declaration challenging parts of Mr. Sercarz's declaration, no objections were made to Mr. Sercarz's

characterization of the proposed witnesses, their availability, or the strategic reasons he chose not to call them to testify on petitioner's behalf.

Petitioner's conclusory assertions and hearsay statements regarding who he believes would have testified on his behalf and what they would have said, made as representations to counsel and not as sworn statements contained in a supporting affidavit, lack any objective basis and are not sufficient to raise disputed issues of fact entitling him to a hearing. Even if a hearing were warranted, petitioner's claims may be evaluated using the existing record and trial counsel's submission. Petitioner's request for a hearing is therefore denied.

### B.    Consideration of Pre-TVPA Conduct in Violation of Due Process

Petitioner asserts that trial counsel's failure to object to the indictment for retroactively applying the TVPA to petitioner's conduct, and subsequent failure to move to exclude pre-enactment evidence or to request limiting jury instructions, constitutes ineffective assistance of counsel because (1) it allowed the jury to be "overwhelmed" by evidence of pre-TVPA conduct that, "while not illegal, was highly prejudicial and doomed [petitioner] to conviction," and (2) it led the Second Circuit to apply a higher standard of review on direct appeal than it would have if the error had been objected to and thus preserved at trial. Am. Pet. at 9; Mem. at 12-13.

Consideration of the pre-enactment conduct charged in the indictment, and introduction of that evidence at trial without a limiting jury instruction, was clearly an error of law that violated petitioner's due process rights. Marcus, 560 U.S. at 264-65; Marcus, 628 F.3d at 42. By failing to notice this ex post facto application of the TVPA to pre-October 2000 conduct, petitioner's counsel fell below an objective standard of reasonableness, satisfying the first prong of Strickland analysis.[11] The pertinent question, then, is whether petitioner was prejudiced by

---

[11] Mr. Sercarz does not seem to challenge that the error was unreasonable. The court notes that, in all fairness to Mr. Sercarz, this error was also committed by the government and the court.

these errors, and whether there is a reasonable probability that the jury would have reached a different outcome on the forced labor charge had trial counsel made the contemplated objections.

The Second Circuit conducted a prejudice inquiry when petitioner's case was remanded by the Supreme Court for plain-error analysis. The Court of Appeals held that "there is no reasonable probability that the jury would have acquitted [petitioner] absent the error . . . [because] the Government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute." Marcus, 628 F.3d at 42. The court also addressed whether petitioner was prejudiced by the pre-TVPA evidence, holding that "nothing about the nature or quantity of the evidence of [petitioner's] pre-enactment conduct leads [the court] to conclude that it is reasonably probable that the jury would have acquitted [petitioner] but for the evidence of [his] pre-enactment conduct." Id. at 43. Notably, the court found that the same error resulted in prejudice as to the sex trafficking conviction because the flawed jury charge could have affected the outcome on that count, given the material differences in the nature of the evidence of pre- and post-TVPA sex trafficking evidence. Id. at 43-44. The Second Circuit thus has already considered and rejected the identical arguments petitioner now raises as part of a claim for ineffective assistance of counsel. There is no basis to deviate from the Circuit's ruling.

Despite that holding, petitioner continues to allege that introduction of the pre-enactment conduct was extremely prejudicial, as the allegedly non-consensual conduct that occurred between October 1999 and October 2000 was particularly extreme in nature, Fahringer Decl., ¶¶ 7-8, and was heavily relied upon during the government's closing summation, id., ¶ 10; Mem. at 14. Petitioner asserts that, had it been objected to, the pre-enactment evidence would not have been admissible as direct evidence because it was not "inextricably intertwined" with the post-enactment conduct nor necessary for context, and would have been excluded under Rule 403 of

the Federal Rules of Evidence because it was needlessly cumulative and its probative value outweighed by danger of unfair prejudice. Mem. at 18-19. Alternatively, petitioner argues that had some of that evidence been admitted under Rule 404(b), jurors would have been instructed on the use of uncharged evidence. Id. at 19.

The government argues that all of the pre-enactment evidence would have been admitted as direct evidence of his crimes under Rule 404(b), as it provided context to the relevant evidence. Gov't. Mem. at 3. Mr. Sercarz states that he could not have "mounted a substantial defense without exploring what the complainant acknowledged was two years of consensual conduct between herself and [petitioner]" prior to the enactment of the TVPA. Sercarz Decl., ¶ 7. In order to challenge Jodi's allegations of non-consensual conduct at any point in time, trial counsel cross-examined Jodi regarding her conduct prior to entering the relationship, id., ¶ 8, the initiation of her relationship with petitioner and her signed "slave petition," id., ¶¶ 8-9, and the extreme but consensual BDSM conduct she engaged in with petitioner, id., ¶ 10, all of which occurred prior to the TVPA's passage. Trial counsel also focused on the one incident of alleged non-consensual conduct prior to October 2000 in order to argue that Jodi was able to refuse petitioner's demands, that when she did so she was punished with conduct similar to conduct she had already engaged in consensually, that she was free to leave the relationship after that episode, and that she nevertheless chose to return to Maryland after visiting her family and chose to move to New York to be closer to petitioner. Id., ¶¶ 11-12. According to trial counsel, it was important that he examine this pre-TVPA conduct to challenge Jodi's version of events and compare it to later conduct in 2001, and he thus "would have chosen to elicit testimony regarding the period that preceded the enactment of the statute in any event, because such testimony was necessary to establish the defense." Id., ¶ 15.

Even if trial counsel had not chosen to rely on pre-enactment conduct in presenting a defense and instead sought to distinguish pre- and post-enactment conduct and evidence and exclude the former, the government would have sought to introduce, and the court would have admitted, evidence of the pre-enactment conduct to present the complete story of Jodi's relationship with petitioner, either as essential background evidence or as proper Rule 404(b) evidence related to the context of the post-enactment, nonconsensual conduct. Petitioner suggests that the government inappropriately used pre-enactment conduct to establish a "climate of fear" as the basis for the force element of forced labor statute, Fahringer Decl., ¶ 9, but that "climate of fear" evidence was necessary and appropriate to explain how and why Jodi was forced to participate in nonconsensual conduct with petitioner during the post-enactment period, and why she felt coerced to remain there and work on the website as a result of petitioner's threats to expose photographs and videos of their extreme BDSM conduct. Pre-enactment evidence of how that climate of fear first developed was also necessary to establish that post-TVPA exposure threats were credible.

Thus, even had trial counsel objected to the admission of pre-TVPA conduct and evidence, it is inconceivable that the allegedly prejudicial evidence would have been excluded. Rather, I would have instructed the jurors to consider the pre-TVPA conduct only as background context for the post-TVPA direct evidence of forced labor. As the Second Circuit already concluded, it is not reasonably likely that the jury would have acquitted petitioner of the forced labor charge had a limiting instruction been given, as there was more than sufficient evidence of post-enactment conduct to support the conviction, and no indication that the jury inappropriately relied on other pre-enactment conduct to determine petitioner's guilt on that charge. Petitioner has thus failed to establish that, but for trial counsel's error, there is a reasonable probability that

the outcome would have been different with respect to the forced labor charge.

Petitioner also argues that he was prejudiced by trial counsel's failure to object to the pre-TVPA evidence and the absence of a limiting instruction at trial because, in doing so, he did not preserve those objections for appeal, and as a result, the Court of Appeals applied the harsher plain error standard of review. Mem. at 16 ("[B]ecause trial counsel failed to preserve the issue, on appeal the Second Circuit only addressed [petitioner's constitutional] claims under the four part plain error standard."). This argument, while creative, lacks merit. The error of failing to distinguish pre- and post-enactment conduct and evidence was a "clear and obvious" one. Marcus, 628 F.3d at 42. Had defense counsel objected to the introduction of pre-enactment evidence, the court would certainly have taken appropriate action by instructing the jury on how to limit its consideration of the pre-enactment evidence. The hypothetical that petitioner envisions – that although the court, once alerted to the date of the TVPA passage, would have ignored that fact, and that, had trial counsel preserved an objection, the Court of Appeals would have reviewed the case under a more lenient standard, resulting in vacating the conviction and remanding for retrial – is a far-fetched and circuitous way to approach the underlying question, what the outcome would have been at trial had the error not been made during trial.[12]

---

[12] Petitioner cites a Third Circuit case that held that a defendant satisfied the second prong of Strickland because he was prejudiced by "trial counsel's failure to preserve a viable First Amendment challenge." Gov't of Virgin Islands v. Vanterpool, 767 F.3d 157, 168 (3d Cir. 2014). In that case, the court observed that the defendant was convicted of conduct that was protected by the First Amendment and that, had that objection been raised at trial, the outcome would have been different – the trial court would likely have ruled in defendant's favor and he would not have been convicted. Where trial counsel had not made this objection, however, the appellate court was unable to overturn the defendant's conviction on direct appeal because the constitutionality of the law had not previously been challenged and it was thus not a "clear and obvious" error under the current law, failing the second prong of the more stringent plain error standard of review.

    The issue in Vanterpool is distinguishable from petitioner's claim in two important ways. First, because the error in Vanterpool was dispositive, the prejudice analysis was simpler – had trial counsel objected, the defendant would not have been convicted, according to the court's constitutional analysis. By contrast, the prejudice to petitioner here is far less clear, as the appropriate objection would only have required a limiting instruction, and would not have been dispositive of petitioner's guilt.

    Second, the appellate court in Vanterpool could not get past the second prong of plain error analysis in order to conduct a prejudice analysis on direct appeal, as trial counsel's error was not "clear and obvious" given the

Although trial counsel did not object to the pre-TVPA conduct and evidence, petitioner was not prejudiced by that error.

## C.    Failure to Call Witnesses

Petitioner alleges that he provided his trial counsel with "an extensive list of individuals who were willing to testify on his behalf to rebut the complainant's version of events," but trial counsel was constitutionally ineffective for failing to call these witnesses.[13] Am. Pet. at 9; Mem. at 21.

Whether to call a particular witness is the type of strategic choice that courts are "ill-suited to second-guess." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (internal quotation marks omitted) ("Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury."); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." (internal quotation marks and citation omitted)); United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (internal quotation marks and citations omitted)). For example, it is a valid strategic decision not to call a witness whose testimony would have been cumulative of other witnesses. United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Other

unsettled constitutionality of the law in question. Here, by contrast, the Court of Appeals found that the "clear and obvious error" prongs of the plain error standard were satisfied, and was, in fact, able to conduct a prejudice analysis under the third and fourth prongs; petitioner merely disagrees with the outcome of that analysis, and would rather have had the court vacate the conviction and remand for retrial under a more lenient standard of review.

Vanterpool is thus distinguishable from petitioner's case.

[13] Although petitioner's briefs occasionally suggest that trial counsel failed to investigate or interview witnesses, see, e.g., Mem. at 21, 30; Reply at 8, the amended petition and the substantive arguments made in the supporting memorandum allege not that counsel failed to investigate any of the witnesses, only that he failed to call certain witnesses to testify, Am. Pet. at 7, 9; Mem. at 21-25. I evaluate petitioner's claims accordingly.

legitimate strategic reasons for choosing not to call a defense witness include, but are not limited to, where the witness's likely testimony is unknown or where the witness may be unfriendly to the defendant; where calling a witness may open the door to potentially damaging testimony about the defendant or other testimony harmful to the defendant; and where the witness may be subject to effective impeachment. See Schulz v. Marshall, 528 F. Supp. 2d 77, 93 (E.D.N.Y. 2007).

Failure to call a witness, however, may constitute ineffective assistance of counsel where it "was not based on . . . a plausible strategic calculus." Pavel v. Hollins, 261 F.3d 210, 222 (2d Cir. 2001). "In order to prevail on a claim of ineffective assistance of counsel based on a lawyer's failure to call certain witnesses, the petitioner must establish what these witnesses would have testified to, and, equally as important, that they would in fact have testified."[14] Mui v. United States, No. 99 CV 3627, 2013 WL 6330661, at *9 (E.D.N.Y. Dec. 5, 2013) (internal quotation marks and alterations omitted).

Petitioner acknowledges that the decision to call witnesses is "typically regarded as a tactical decision that does not support a claim of ineffective assistance of counsel." Mem. at 29. He argues, however, that such a decision must be grounded in a strategy serving the interests of the defendant, and that, in his case, there was "no strategic reason for counsel's failure to call these . . . witnesses" and the "decision to forgo . . . calling the suggested witnesses was because of [trial counsel's] other pending cases and commitments." Mem. at 29-30; see also Reply at 9. Petitioner claims that without these witnesses, trial counsel "could not mount an effective

---

[14] As discussed above, petitioner has not provided competent evidence, beyond his own unsworn and self-serving representations to counsel, establishing that the witnesses would have testified or what they would have said. For this reason alone, petitioner has failed to establish that trial counsel was ineffective in failing to call the witnesses. However, as discussed below, even assuming petitioner's assertions are credible, he has failed to establish either (1) that trial counsel did not have any strategic reasons for not calling the proposed witnesses, or (2) that any error committed by trial counsel was prejudicial.

defense" and "was not able to demonstrate [petitioner's] true character and dispel the false version presented by the prosecution." Mem. at 29-30; see also Reply at 9.

### 1.    Fact and Character Witnesses

Petitioner claims that a number of the women with whom he had BDSM relationships would have testified on his behalf, had trial counsel elected to call them. According to petitioner, the following women would have testified to the following matters:

(1) Joanna would have testified that, while living with her, Jodi was "not coerced into any activity with [petitioner]," had full freedom of time and movement, could have left petitioner at any time, and was not forced to work on the website and did so less than 10 hours per month. Am. Pet. at 9.

(2) Beth, who lived with Jodi in Maryland, would have testified that Jodi was not coerced into any sexual activity, was free to leave the apartment, and was rarely visited by petitioner. Id.

(3) Celia would have testified that she did not observe petitioner coerce Jodi at any time. Defendant alleges that counsel's stipulation to having Celia's testimony read into evidence at trial prevented the jurors from assessing her demeanor and veracity. Id. at 10.

(4) Sherri, a woman with whom petitioner lived in New York from approximately 1993 through 2001, would have testified that petitioner was never away from home for more than three to four days per month, refuting Jodi's claims as to the frequency of his presence in Maryland and visits in New York. Id.

(5) Shoshanna, who wrote diary entries and was photographed for petitioner's website, would have testified that "everyone who worked on the website did so willingly and consensually," and that Jodi spoke favorably of petitioner and sought to resume working on the website even after her relationship with petitioner ended. Id.

(6) Susan, another woman who wrote diary entries and was photographed for petitioner's website, would have testified that everyone who worked on the website did so consensually; that certain graphic photographs, which the government argued were of Jodi, were actually of Susan; and that the photographs on the website "were altered to create a more startling effect." Id. at 10-11.

(7) Linda, with whom petitioner had a relationship, would have testified regarding the March 2001 photoshoot at Sherri's house during which Jodi received what was to be her final punishment. Id. at 11. Linda would have attested that she arrived at the house shortly after that incident ended, and observed that Jodi was free to leave the home and was not restrained. Id.

As noted above, Mr. Sercarz asserts that he did not call Joanna and Celia to testify on behalf of petitioner at trial because each of them had informed him, through counsel, that she did not want to speak with him, and he thus determined that calling them to testify would have been too risky. Sercarz Decl., ¶¶ 25-26. However, because Celia had given a statement beneficial to petitioner's defense, Mr. Sercarz was able to introduce the exculpatory portion of her statement by stipulation.[15] Id., ¶ 25.

Mr. Sercarz does not recall the specific reasons why he decided not to call Beth, Sherri,[16] Shoshanna, Susan, or Linda to testify. He notes, however, that unlike Joanna and Celia, who were present during the incident when, Jodi testified, her relationship with petitioner became nonconsensual, these other women were not generally present during the "critical episodes" described in the complaint. Sercarz Decl., ¶ 27. Mr. Sercarz also states that it was his professional judgment that several of the women would have been "poor defense witnesses" and their "demeanor and appearance would have reinforced the notion that [petitioner] was taking advantage of [vulnerable] women." Id. For example, trial counsel recalls that one of the women was extremely thin and had visible burn marks on her arms. Id. He also considered the strategic disadvantage of calling women who were "in submission" to petitioner, because any witness who testified to being in a "benign" relationship with petitioner could have been impeached based on her "subservience" to him. Id., ¶ 28. Finally, Mr. Sercarz considered whether their testimony would have hurt petitioner by highlighting the fact that petitioner was involved in BDSM relationships with many women and had subjected Jodi to a level of punishment that was

---

[15] Mr. Sercarz stated in his closing argument that Celia was unavailable to testify due to a medical condition. Trial Transcript ("Tr."), United States v. Marcus, No. 05-CR-457 (E.D.N.Y.), Dkt. #240-250, at 1163.

[16] A memorandum submitted by Mr. Sercarz along with his affidavit indicates that he spoke with Sherri and asked for permission to speak to her attorney, but does not indicate whether she was ultimately willing to testify. Ex. A to Sercarz Decl. The memorandum does note that Sherri was "angry" that petitioner's conduct had involved her "in a way that she was unaware of." Id.

extreme in comparison to his other partners. Id.; Tr. at 207-208. Although Mr. Sercarz did not call any of these witnesses, the defense did call Rona, with whom Jodi lived when she first arrived in New York, to testify regarding her observations and understanding of petitioner's relationship with Jodi and their BDSM activities. Tr. at 656.

Petitioner also alleges that trial counsel should have called petitioner's longtime friend, Dr. Charles Pellegrino, to testify about petitioner's "character" and counter the government's theory that he thought of himself as a god-like individual who could act with impunity. Am. Pet. at 11. Mr. Sercarz challenges the claim, noting that doing so would have opened the door to rebuttal character evidence regarding petitioner's extreme conduct towards the women with whom he engaged in BDSM relationships, id., ¶ 33, and that, given the nature of petitioner's alleged conduct, "any effort to suggest that [petitioner] possessed traits of character which made it unlikely that he would keep the [c]omplainant against her will would not only have fallen on deaf ears but would also have caused the lawyer presenting such evidence to lose credibility with the jury," id., ¶ 32. This concern was evident during the testimony of the first defense witness, petitioner's daughter. Tr. at 617-38. Trial counsel called her as a fact witness, but was admonished by the court that careless questioning could open the door to character testimony and the "nightmare" of possible rebuttal cross-examination or witnesses. Tr. at 621.

Petitioner further claims that trial counsel should have called Harry Suissa, an attorney who met with petitioner and Jodi when Jodi was trying to get an order of protection against Joanna. Am. Pet. at 11. Petitioner apparently represented to counsel that Mr. Suissa would have testified that Jodi rejected petitioner's suggestion that she return home to the Midwest, instead expressing "a strong desire to move to New York to be close to [petitioner] and to live with another one of his friends." Id. Mr. Sercarz asserts that his cross-examination of the complainant

regarding her living arrangements in New York, and her decision to live close to petitioner even after the relationship ended, "rendered it unnecessary" to call Mr. Suissa. Sercarz Decl., ¶ 23 n.3.

Trial counsel has thus articulated multiple sound strategic reasons for not calling these witnesses. Furthermore, petitioner has not demonstrated that failure to elicit the anticipated testimony of the witnesses significantly prejudiced him and would have undermined his conviction on the forced labor charge. For example, testimony that Jodi wanted to continue working on the website after her relationship with petitioner ended, while perhaps favorable to petitioner, is not inconsistent with the government's theory that she was doing so in order to retain some control over the use of her photos and to avoid being exposed by petitioner. Similarly, testimony that Jodi was physically free to come and go, or that, although given an opportunity to return home, Jodi stated that she did not want to leave petitioner, does not contradict Jodi's testimony that she felt coerced into continuing her relationship with petitioner due to his threats of exposure. Nor is it inconsistent with her accounts of being severely punished for failing to perform adequate work on the petitioner's website.

Petitioner has failed to establish that trial counsel's decision not to call these witnesses was without any plausible strategic rationale such that it constituted ineffective assistance, or that failing to call these witnesses prejudiced him with respect to the forced labor charge for which he was convicted.

### 2.    Expert Witnesses

Petitioner claims that trial counsel failed to call several expert witnesses who were necessary to mount an adequate defense. Mem. at 26.

First, petitioner alleges that trial counsel should have called an expert medical witness to review medical records and conduct an examination of Jodi, in order to counter Jodi's allegations

that she suffered from Post Traumatic Stress Disorder ("PTSD") as well as the prosecution's implication that she suffered from Stockholm Syndrome. Am. Pet. at 11. Mr. Sercarz states, however, that there was no mention of PTSD or Stockholm Syndrome during the trial, and that any defense effort to examine the complainant or offer expert testimony regarding her mental state would have opened the door to such evidence. Sercarz Decl., ¶ 29. In fact, Mr. Sercarz did seek access to medical records in contemplation of expert medical testimony, United States v. Marcus, No. 05-CR-457 (E.D.N.Y.), Dkt. # 129, 143, but was ultimately successful in excluding the government's proposed expert witness who would have testified concerning these psychological conditions, Dkt. # 145, 149, 157, 197. Petitioner also alleges that an expert witness could have testified as to "whether [petitioner] possessed the personality traits to force individuals to act against their will," Am. Pet. at 11, but offers neither evidence supporting his assertion that any witness would have testified to that effect, nor any legal basis upon which he would have been entitled to call an "expert" to testify about the nature of petitioner's character.

Petitioner also argues that trial counsel should have called a computer and internet expert to challenge various aspects of the government's evidence regarding the Slavespace website. Id. at 12; Mem. at 26-29. According to petitioner's counsel, a computer expert could have (1) challenged the authenticity of online chat room conversations and postings attributed to petitioner; (2) discredited the theory that Jodi was forced to click advertisements on the website to drive up traffic numbers; (3) impeached the testimony of the FBI special agent with whom Jodi communicated by email, who claimed that all of those emails had been lost; (4) established that the photographs on the Slavespace website may have been altered and that the date stamp reflected the date of alteration rather than the date they were taken; and (5) explained to the jury that the "snapshot" version of the website shown by the prosecution did not accurately portray

the interactive nature of the site and thus failed to convey its "tongue-in-cheek" and "satirical" nature. Id.

Mr. Sercarz states that he cross-examined the complainant and the FBI agent regarding whether the ad-clicking scheme could have been effective, and that, in any event, Jodi's work on the website included not just banner-clicking but also posting photographs, writing diary entries, and maintaining memberships. Sercarz Decl., ¶ 30; see also Tr. at 333-34. Thus, trial counsel could reasonably have decided that calling a computer expert would have been cumulative and ineffective as to the ad-clicking allegation.

Furthermore, trial counsel and the government engaged in lengthy pre-trial discussions concerning how much of, and in what format, the website would be available to jurors during deliberation. United States v. Marcus, No. 05-CR-457 (E.D.N.Y.), Dkt. #166, 178, 239. The jurors were given a limiting instruction addressing the missing interactive features that petitioner now raises, Tr. at 1243, and in any event, were instructed to consider the full website only on the obscenity charge, for which petitioner was ultimately acquitted.

Petitioner insinuates, but does not explicitly assert, that certain conversations and postings attributed to him were not authentic. However, there is no evidence indicating that petitioner was not responsible for those conversations. Furthermore, trial counsel also relied on the chat transcripts, which were used to support the defense's theory that Jodi was free to leave petitioner if she wished to do so. Tr. at 306-07.

Although petitioner appears to assert that some photographs on the website may have been altered, and that, despite their post-enactment date stamps, they may have been taken prior to the enactment of the TVPA, he points to no evidence that this is in fact the case.[17] Indeed, he

---

[17] Trial counsel did, in fact, raise the possibility that the photographs were altered during his closing summation. Tr. at 1110, 1167.

does not explain how such claims are even relevant to the forced labor count. Regardless of when the photographs were taken and who they depict, Jodi's testimony that she felt coerced into maintaining membership information and posting photographs and diary entries to the website, post-TVPA enactment, amply sustains the forced labor conviction.

Finally, petitioner has failed to provide any evidence or explanation regarding how lost e-mails between Jodi and the FBI agent could have been used to impeach the agent, or how such impeachment would have undermined the government's case on the forced labor count.

In sum, in light of trial counsel's strategic choices and petitioner's failure to establish any prejudice from the decision not to call expert computer and medical witnesses, petitioner's ineffective assistance claims as to these witnesses fail.

### D.    Failure to Introduce or Object to Certain Evidence

Petitioner asserts trial counsel erred by failing to introduce certain evidence and failing to object to other evidence. "[T]rial decisions to offer or stipulate to certain evidence, [and] decisions such as when to object and on what grounds[,] are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (internal citations and quotation marks omitted).

Petitioner places great emphasis on a February 2002 e-mail from Jodi to petitioner, not introduced into evidence at trial, in which Jodi asked for petitioner's forgiveness and requested to keep working on the website, stating that she "was and would be grateful to work on the site." 2/1/02 E-mail; Am. Pet. at 9-10; Mem. at 20. Petitioner alleges that this e-mail would have "disproved the prosecution's claim that Jodi was forced to work on the website," Am. Pet. at 13, and would have "debunked the forced labor allegation" and "completely exculpated the

[petitioner] of the charged offense" by establishing that the "complainant willingly and voluntarily worked on the website at all times," Mem. at 20.

Mr. Sercarz attests that he has "no recollection" of having received the e-mail from either petitioner or the government.[18] Sercarz Decl., ¶ 18. However, he points to other ways in which he challenged Jodi's testimony that she was forced to work on the website, including her testimony that the April 2001 punishment she received from petitioner was administered because she was not working hard enough on his website. For example, during his cross-examination of Jodi, Mr. Sercarz elicited testimony regarding her continued engagement with petitioner after she moved away from Rona's apartment in April 2001. Id. This included testimony about a diary entry published on the website describing the April 2001 punishment, which, unlike prior diary entries, did not describe her punishment as being related to her failure to work on petitioner's website, id., ¶ 19; testimony that although she lived in her own apartment for four years, she did not seek assistance regarding her relationship with petitioner, id., ¶ 20; and testimony that, while living alone, she maintained contact with petitioner, and even joined him and his family on camping trips, id., ¶ 21. Indeed, Mr. Sercarz elicited testimony that Jodi was ambivalent regarding her relationship with petitioner, and that she had difficulty "break[ing] free" from him. Id. Finally, Mr. Sercarz offered into evidence photographs from the Slavespace website of Jodi engaging in BDSM activities with the petitioner in her apartment after their relationship ended, conduct that Jodi admitted had been consensual. Id., ¶ 22.

In any case, petitioner exaggerates the e-mail's strength as "direct evidence" that Jodi's work on the website was consensual. Fahringer Decl., ¶ 14 (emphasis omitted). It was significant to the government's theory of the case that, for some period of time, Jodi remained with

---

[18] Petitioner counters that the e-mail was turned over by the government before trial, that petitioner himself gave trial counsel a print-out of the e-mail prior to trial, and that the e-mail was contained in the files that trial counsel gave to petitioner's current counsel prior to his direct appeals. Fahringer Decl., ¶ 13.

petitioner against her will in part because he threatened to expose explicit photographs of her to her family, and Jodi testified that she maintained contact with petitioner in order to feel "some small bit of control" over those photographs. Tr. at 174. An e-mail expressing an interest in continuing to work on the website fits squarely within that theory. Furthermore, that Jodi expressed an interest in working on the website after she had moved out of Rona's apartment and had consensual relations with petitioner is not inconsistent with the allegations that she previously worked on the website for a period of time during which she was in a nonconsensual relationship with petitioner. Thus, the e-mail was cumulative of other evidence and testimony, and introducing it would not have altered the jury's verdict.

Petitioner also alleges that he was prejudiced by trial counsel's failure to object to the admission of a "prop box" containing various items used in BDSM activities. Am. Pet. at 13. According to petitioner, some of the items were Jodi's, some were purchased after Jodi left, and others were more innocuous than they may have seemed, such as a pair of toy handcuffs equipped with a quick release button. Id. Petitioner has not pointed to evidence substantiating these claims, nor has he suggested how he was prejudiced by the admission of these items into evidence, given that many if not all appeared in photographs posted on the website. Furthermore, trial counsel cross-examined the FBI agent regarding these items, Tr. at 523-24, and cross-examined Jodi regarding her consensual use of some of the items and other consensual BDSM activities in which she engaged, Tr. at 225-29, 252-55, 263, 281-82. Thus, trial counsel's decision not to object to their admission or dwell on them during testimony could well have been a reasonable strategic decision, and is not a sufficient basis for a claim of ineffective assistance of counsel.

### E.    Other Ineffective Assistance Allegations[19]

#### 1.    Inadequate Preparation and Cross-Examination

Petitioner alleges that trial counsel's performance was hampered by other commitments

that prevented him from adequately preparing for petitioner's trial. Am. Pet. at 13. He does not

substantiate this claim with any evidence or even suggest what commitments distracted Mr.

Sercarz or how petitioner's trial was adversely affected. The government responds that the

"record of zealous representation [petitioner] received at trial . . . belies such a claim," noting

that trial counsel cross-examined government witnesses, called defense witnesses, filed pretrial

motions, and made arguments at trial. Gov. Mem. at 5. Based on my observations of Mr. Sercarz

during extensive pre-trial motion practice, as well as his performance during opening argument,

cross-examinations, the defense's case, and summation, I find that Mr. Sercarz appeared wholly

focused on zealously representing his client, that his performance was of extremely high quality,

and that his defense of petitioner was extraordinarily skilled.

Petitioner also asserts that counsel failed to make use of critical information to cross-

examine Jodi, such as a bankruptcy statement allegedly containing false information about her

sources of income, or her waiting more than three years after her relationship with petitioner

ended before contacting the FBI. Am. Pet. at 9. In fact, Mr. Sercarz conducted an exhaustive and

thorough cross-examination of Jodi, focusing on undermining her credibility by challenging key

aspects of her testimony. Tr. at 214-378. Petitioner does not suggest how he was prejudiced by

counsel's decision to pose limited questions to Jodi regarding the bankruptcy statement, Tr. at

363, and it is well within reasonable strategy for trial counsel to focus on certain relevant

impeachment inquiries to the exclusion of other, less important ones. Furthermore, contrary to

---

[19] Petitioner has withdrawn his allegation that trial counsel did not prepare a juror questionnaire, Am. Pet. at 14; Fahringer Decl., ¶ 15 n.3, after Mr. Sercarz noted that he did, in fact, submit a proposed questionnaire, Sercarz Decl., ¶ 4, n.1.

counsel's contention, both on cross-examination and in his summation, Mr. Sercarz addressed Jodi's delay in approaching the FBI regarding her allegations, and her initial failure to report the conduct underlying the forced labor charge. Mr. Sercarz artfully developed a defense theory that all of Jodi's conduct had been consensual and that her subsequent accusations against petitioner were made in an attempt to have her photos removed from the website. Tr. at 351-53, 366-67, 1119, 1124-1125. Petitioner's claims of ineffective preparation and cross-examination are therefore unfounded.

### 2. Witnesses Testifying Under First Names

Petitioner alleges that trial counsel was ineffective for failing to prevent Jodi from testifying at trial using only her first name, making it more difficult for potential witnesses who may have known Jodi to come forward and demonstrate her active participation in the BDSM community apart from her relationship with petitioner. Am. Pet. at 13; Mem. at 30. This claim is without merit. The decision to allow Jodi, another government witness, and defense witnesses to testify using only their first names was a carefully crafted compromise reached by the court, the government, and trial counsel, balancing the need for sensitivity with petitioner's investigative interests. See Marcus, 487 F. Supp. 2d at 293 n.2; United States v. Marcus, No. 05-CR-457 (E.D.N.Y.), Dkt. #179, at 4 (noting that petitioner had the full names of government witnesses for out-of-court investigation purposes and was able to use screen names to elicit information from the online BDSM community, thus holding that trial counsel's contention "that there may be witnesses who come forward during trial with information after learning the witnesses' full names is purely speculative"); see also Marcus, 628 F.3d at 45 n.12 (dismissing this claim as meritless). Although petitioner's current counsel may disagree with prior rulings by this court and the Court of Appeals regarding this issue, they were not the result of any error or poor

33

performance on the part of Mr. Sercarz, who effectively articulated the same concerns prior to trial.

### 3. Trial Counsel's Delegation of Witnesses to Associate Counsel

Petitioner alleges that trial counsel's decision to permit his junior associate, Julia Gatto, Esq., to conduct direct examination of two of the three defense witnesses constituted ineffective assistance because, petitioner claims, Ms. Gatto "failed to effectively examine the witnesses" and failed to prepare them for aggressive questioning they might face on cross-examination. Am. Pet. at 14.

Mr. Sercarz states that while Ms. Gatto conducted the examinations, it was he who prepared the witnesses for trial. Sercarz Decl., ¶ 34. He also states, and the court concurs, that Ms. Gatto was "eminently capable of conducting a direct examination of the two [defense] witnesses," and that the decision to have her conduct the examination of the defenses witnesses was a strategic one, namely, to show the jury that a woman was actively involved in petitioner's defense, and to distance Mr. Sercarz from the cross-examination of petitioner's daughter. Id. Petitioner has failed to establish that trial counsel's decision to have Ms. Gatto examine the two defense witnesses was erroneous or prejudicial.

### 4. Trial Counsel's Closing Argument

Finally, petitioner alleges that trial counsel's closing argument was ineffective because it "did not address the pertinent issues in the case," including the fact that [petitioner] never coerced Jodi to work on his website"; did not impeach Jodi's credibility; did not provide "a narrative of the events or a timeline other than the one presented by the prosecution"; did not present petitioner in a positive light, but rather implied that he was "disgusting"; and implied that petitioner had lived with Jodi for some time. Am. Pet. at 14. Mr. Sercarz counters that the

government's theory at trial was not that Jodi was specifically coerced into working on the website but rather that she was forced to stay in a relationship with petitioner against her will, and that work on the website, including taking photographs and writing diary entries, was part of that relationship. Sercarz Decl., ¶ 39. Thus, Mr. Sercarz claims, he focused his summation on establishing that Jodi was not compelled to stay in a relationship with petitioner against her will, attacking the foundation of both the forced labor and sex trafficking charges. Id.

The court has reviewed Mr. Sercarz's lengthy and thorough closing summation, Tr. at 1094-1204, and finds that petitioner's claims lack merit. Mr. Sercarz undoubtedly made many strategic decisions in choosing to emphasize certain aspects of the trial evidence over others, and none of these strategic choices may be second-guessed as the basis for an ineffective assistance of counsel claim. Mr. Sercarz argued that Jodi's work on the website was merely "incidental" to her relationship with petitioner and only a minor aspect of the power dynamic between them, thus focusing his efforts on attacking the government's version of that relationship. Tr. at 1185. He countered the government's theory of the case by identifying inconsistencies in Jodi's testimony, arguing that her account of the non-consensual behavior was not credible and lacked corroboration. Tr. at 1132-33. He also pointed to the complex nature of her relationship with petitioner, emphasizing the fact that she continued to take consensual BDSM photographs with petitioner even after her nonconsensual conduct had concluded. Tr. at 1171. Trial counsel even offered a credible alternative theory of Jodi's motivations, that she approached the FBI not to report petitioner's conduct, but only because she wanted her photographs removed from his website. Tr. at 1129.

In his summation, Mr. Sercarz referred to some of the evidence that the jurors had viewed as "disgusting." Tr. at 1094. Such a statement was an appropriate recognition of the jurors'

unpleasant task of reviewing certain photographic evidence, and part of a reasonable strategic decision to avoid painting petitioner as likeable or sympathetic. Instead, Mr. Sercarz acknowledged the jurors' likely feelings towards petitioner and focused his arguments on reasonable doubt and areas of weakness in the government's case.

### F.    Totality of Ineffective Assistance Claims

Petitioner argues that while any one of the errors discussed above would, by itself, constitute ineffective assistance, "certainly the cumulative effect of these many failures" deprived petitioner of his Sixth Amendment right to effective assistance of counsel. Mem. at 33. In addition to examining separately Mr. Sercarz's trial management and performance and his decisions not to call certain witnesses or introduce certain evidence, I have also considered the totality of Mr. Sercarz's actions and decisions at trial. I find that as a whole, they constitute a reasonable trial strategy and therefore fail to satisfy the first prong of the Strickland analysis.[20]


## III.   Petitioner's Due Process Claims

### A.    Interpretation of the Forced Labor Statute

Petitioner argues that two recent cases clarify that the forced labor statute does not cover domestic relationships, and that application of the law in his case "impermissibly intrude[d] on [his] intimate relationship [with Jodi]." Mem. at 37.

First, petitioner argues that in United States v. Toviave, 761 F.3d 623 (6th Cir. 2014), the Court of Appeals for the Sixth Circuit reversed a forced labor conviction on the grounds that it was applied to intimate domestic relationships in an impermissible way. While true, petitioner's

---

[20] Furthermore, although I need not reach the prejudice prong of Strickland, even if petitioner's allegations as a whole constituted unreasonable error on the part of trial counsel, petitioner has not demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

reading of that case is overly broad. <u>Toviave</u> involved a man who required four young relatives to cook, clean, do laundry, and babysit in his home, and he beat them if they did not do their household chores or homework. <u>Id.</u> at 624. The court held that the forced labor statute did not apply to "forcing children to do household chores," which it deemed a "widely accepted parental right[ ]," and that the alleged conduct was more suitably addressed by state child abuse laws. <u>Id.</u> at 625. The court made several important distinctions and observations. First, it noted that the actual parent/child relationship status was less relevant than the nature of the labor, as "[a] forced-labor sweatshop could be run by a parent of one of the victims." <u>Id.</u> at 626. It also distinguished that case from "[o]ther cases in which forced labor has been found in the household context," where victims, typically domestic servants, were subjected to "extreme isolation" and "intolerable living conditions." <u>Id.</u> at 629-30. Finally, the court distinguished the children's household chores in that case from "paradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service." <u>Id.</u> at 626.

This case is easily distinguishable from <u>Toviave</u>, as the labor in question was not a "household chore" but rather work on a for-profit business enterprise run by petitioner, from which he alone received the proceeds. Furthermore, federal criminalization of petitioner's conduct with respect to the complainant's work on the website, which the jury found to be nonconsensual, does not infringe on any widely accepted rights comparable to the tradition of children performing household chores.

Petitioner also cites <u>Spiteri v. Russo</u>, No. 12-CV-2780, 2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013). In that civil case, the plaintiff sued his employers under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), claiming that they enriched themselves at his expense despite paying him $75 per hour and commissions for his work. <u>Id.</u> at *44. In his memorandum

opposing a motion to dismiss, the plaintiff invoked the forced labor law as a RICO predicate act. In a footnote, the court dismissed this argument, noting that the plaintiff had "failed to plausibly allege that he was forced to continue to work for [the defendants] given . . . his assertions that (1) he traveled freely while working for [defendants], (2) he continued to work for other [employers] . . . (3) he worked with a great deal of autonomy, and (4) he freely discontinued working for [defendants]." Id. at *47 n.54. Petitioner claims that, like the plaintiff in Spiteri, Jodi traveled freely while working, worked outside the home for others, and had control over her income and was free to come and go as she pleased. Mem. at 38. Thus, petitioner argues, "it cannot be said that Jodi was forced to work on the website and her voluntary conduct cannot support a conviction for forced labor." Id.

This footnote, in the civil case of a pro se litigant invoking the forced labor statute as a RICO predicate act for the first time in his opposition brief, does not establish that a forced labor charge cannot be sustained in a criminal case where a complainant retained some or all of the four articulated measures of freedom of work. Here, the jury was instructed on the elements of the forced labor charge and concluded that, even though she was given some freedom of movement and employment, Jodi was forced to remain in a nonconsensual relationship with petitioner during which time she worked on his website, without pay, and was severely punished if she failed to do so.

Neither of the cases raised by petitioner apply to this case, bind this court, or alter the reasoning set forth by this court and the Second Circuit when rejecting the defense challenge to the application of the forced labor statute to domestic relationships. See Marcus, 487 F. Supp. 2d at 299, 372-28; Marcus, 628 F.3d at 44-45. Petitioner's argument that superseding case law undermines his conviction for forced labor is therefore meritless.

38

## B.    Actual Innocence

"In order to demonstrate actual innocence . . . a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" Lucidore v. New York State Div. of Parole, 209 F.3d 107, 114 (2d Cir. 2000) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)) (alteration in original); see also Rivas v. Fischer, 687 F.3d 514, 539-40 (2d Cir. 2012).

Petitioner argues that he is actually innocent of the forced labor charge. He bases this argument on the fact that he and Jodi were in a consensual BDSM relationship, that he provided Jodi with a place to live rent-free, that Jodi had control of her own external income and was free to come and go as she pleased, and that Jodi consensually collaborated with petitioner on the website by uploading photographs, writing diary entries, and maintaining the website. Am. Pet. at 17; Mem. at 36. Petitioner argues that if the case had been presented to a jury "without the avalanche of prejudicial evidence that flooded into the case by the misapplication of the relevant period and other errors, no reasonable juror would have convicted [petitioner] of the charged crime." Id. at 37. Petitioner also argues that if the jury had known about the post-relationship e-mail in which Jodi expressed her desire to continue working on the website, a reasonable jury would not have convicted him of the forced labor charge. Am. Pet. at 16; see also Mem. at 37 (the e-mail "is sufficient to demonstrate [petitioner's] factual innocence").

For the reasons discussed above, petitioner was not prejudiced by trial counsel's strategic decisions to allow the introduction of some evidence and not introduce other evidence or testimony. Petitioner merely rehashes the defense theory offered at trial, which the jury reasonably rejected. As the Second Circuit already held when it conducted a prejudice inquiry, it

is more likely than not that the jury would have reached the same verdict even absent the evidence to which petitioner objects (though it is highly doubtful that evidence would not have been introduced in any event). Similarly, it would have reached the same conclusion even if it had considered the 2012 e-mail. Petitioner has offered no support for his actual innocence claim other than his own self-serving statement, and has failed to overcome the high standard required to overturn his conviction.

## CONCLUSION

As set forth above, petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 is denied in its entirety. Furthermore, because petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no Certificate of Appealability will issue. Petitioner may seek such a certificate from the Second Circuit Court of Appeals. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

s/Allyne R. Ross

_____
Allyne R. Ross
United States District Judge

Dated: June 19, 2015
       Brooklyn, New York